## UNITED STATES v. STEWART.

### No. 13959.

United States Court of Appeals
Fifth Circuit.

Jan. 14, 1953.

**136**

K. M. Nolen, Asst. U. S. Atty., and Brian S. Odem, U. S. Atty., Houston, Tex., for appellant.

Jack R. Blackmon, Corpus Christi, Tex., for appellee.

Before HUTCHESON, Chief Judge, and BORAH and RIVES, Circuit Judges.

RIVES, Circuit Judge.

This suit was brought under the Federal Tort Claims Act[1] by Ernest W. Stewart against the United States for damages sustained by him as the result of bullet wounds in his arm and head on September 19, 1949, at Zapata, Texas.

Border Patrol Inspector Charles T. Stone was stationed at the office of the Immigration and Naturalization Service of the Department of Justice at Zapata, Texas, at the time of the injury complained of. His hours of duty were from 3:00 a. m. until 11:00 a. m. At about 3:00 a. m. Stone went to the office and began working on a report. Ten or fifteen minutes later he left the office for his living quarters, which were on the government premises, to obtain a dictionary. There is testimony that upon returning to the office he heard a shot which came from a southerly direction. Another Border Patrolman on duty with Stone, John Amerson, testified that he heard two shots, which apparently came from a direction southwest of the office. A group of dogs had run through the Government premises while Stone was first working on his report and about 4:00 a. m. they returned and began barking and creating considerable disturbance. In an attempt to frighten these dogs off the premises and quell the disturbance, Stone left the office and fired his pistol in a "southerly direction", over a fence and into a ditch near the dogs, at an angle of about 25 or 30 degrees. Across the highway from the office of the Immigration and Naturalization Service, where Inspectors Stone and Amerson were on duty, was a partially open vegetable shed, located approximately 125 feet from the fence enclosing the government premises where Stone fired his pistol into the ground. Appellee, Stewart, had been living and sleeping in this shed for several months, and on the night of his injury had gone to bed about 10:30 or 10:45 p. m. He awakened during the early morning when his arm "felt kind of sticky" and he had a pain in his head, whereupon he went to the house of one Lee Roy Weaver who contacted Inspectors Stone and Amerson and the two officers took him to Laredo, Texas, to a doctor. Medical examination revealed that appellee had been struck by a bullet which had penetrated his upper left arm and skull behind his left ear, and that numerous fragments of the missile were lodged in his brain, causing permanent injuries.

The government contends that the trial court erred (1) in finding that the bullet fired by the government employee, Stone, was the same bullet which struck Stewart, because such finding is not supported by the evidence; and (2) in finding that when

<hr />

1. 28 U.S.C.A. § 1346(b).

Stone fired the pistol he was acting within the scope of his employment so as to render the United States responsible in damages under the Federal Tort Claims Act.

Appellee's theory is that the bullet fired from Stone's pistol ricocheted across the highway and travelled in a southwesterly direction toward the vegetable shed for a distance of some 125 feet, finally striking Stewart as he was asleep inside; that the physical positions of the persons involved, and all the other attendant facts and circumstances furnish adequate support for the trial court's conclusion that Stone's bullet caused the injuries. On the question of whether Stone's discharge of the pistol under the circumstances was within the scope of his employment, appellee contends that under the Tort Claims Act and the applicable Texas authorities his act was so closely related to and connected with the proper discharge of his duties as to render the United States liable in damages for the resulting injury.

 It is without dispute that Stone fired one bullet from his .38 caliber service revolver in a "southerly direction" just a short while before he was notified of Stewart's injuries. The vegetable shed in which Stewart was sleeping in at least a partially exposed position was only 125 feet away and the wound in his upper left arm and skull was caused by a large caliber bullet either spent or ricocheted when it struck him. The government's contention that Stewart's injury was more probably caused by the shot or shots which Stone and Amerson claimed to have heard fired prior to that fired by Stone is uncon-

vincing,[2] particularly in the light of testimony by Lee Roy Weaver that his prior statement corroborating their testimony was false and made only for the purpose of helping Stone in his departmental investigation. In view of the conflict in the testimony, the question of whether Stone's bullet was the one which struck Stewart was purely a question of fact, properly determinable by the trial court from all the facts and circumstances, including his physical inspection of the premises. The trial court's findings are presumed to be supported by the evidence, especially where pertinent evidence is omitted from the record on appeal.[3] The observations made by the court from its physical inspection of the premises were for all purposes matters of evidence that were not and could not be set out in the record.[4] In addition to its advantage of observing the witnesses and passing upon their credibility, the district court was afforded an opportunity for information material for a proper consideration of the issue that is not now presented to this court.[5] In such a case, it is not within this court's province to substitute its findings of fact for those of the trial court, particularly since they are supported by substantial evidence and are not clearly erroneous.[6]

 The issue of whether Stone was acting within the scope of his employment in discharging the bullet causing Stewart's injuries was also resolved against the government and in favor of Stewart by the trial court, and that finding we cannot hold to be clearly erroneous. If a private employer would have been liable in damages

2. Stone claimed to have heard one shot fired prior to the time he discharged his own pistol, which sounded like a .22 caliber rifle. Amerson testified he heard two rifle shots, while two other witnesses, Manuel Medina and Lee Roy Weaver, testified that they heard only one shot distinctly. No explanation in rebuttal of Stewart's case was offered by the Government as to who might have fired the prior shots, why they were fired, etc., nor was there any testimony from the Government, which alone was in position to investigate, that it searched the surface of the ditch where the bullet was fired, and that the bullet was either buried, or there was evidence that it ricocheted.

3. Krauss Bros. Lumber Co. v. Mellon, 276 U.S. 386, 390, 48 S.Ct. 358, 72 L.Ed. 620; Griffiths Dairy v. Squire, 9 Cir., 138 F.2d 758, 760; Carter Oil Co. v. Norman, 7 Cir., 131 F.2d 451, 456; Pacific Mail S. S. Co. v. Balderach, 5 Cir., 229 F. 562.

4. Alabama Power Co. v. Fergusen, 205 Ala. 204, 87 So. 796, 797.

5. City of Montgomery v. Ferguson, 207 Ala. 430, 93 So. 4, 6.

6. Rule 52(a), Fed.Rules Civ.Proc. 28 U.S. C.A.; U. S. v. Fotopulos, 9 Cir., 180 F. 2d 631.

138

to Stewart under the facts and circumstances proven, and under the Texas decisions, then the United States is liable under the Tort Claims Act. 28 U.S.C.A. § 1346(b). It was Stone's duty and responsibility to keep peace on the government's premises and to remove sources of annoyance or disturbance there which interfered with the proper discharge of his duties. It was further Stone's duty to make out reports on employees as speedily and accurately as possible. The evidence shows that he worked on the report for a while before the dogs first came on the premises; that after procuring the dictionary from his living quarters for use in making the report he attempted to finish it but the dogs returned and created such a disturbance that they interfered with his concentration and disrupted his efforts. He thereupon laid aside the report, left the office and fired his pistol intentionally, and solely for the purpose of scaring the dogs away in order that he might complete the report without being further molested by them. He resumed his duties immediately after firing the shot which frightened the dogs away. Under such circumstances, the trial court was clearly authorized to find that Stone's act in firing the pistol was "within the scope of his employment" under the Texas decisions and within the meaning of the Federal Tort Claims Act.[7]

The judgment is

Affirmed.

7. Texas & N. O. Railroad Co. v. Parsons, 102 Tex. 157, 113 S.W. 914; Hudson v. St. Louis Southwestern Ry. Co. of Texas, Tex.Com.App., 293 S.W. 811; More-

man v. Armour & Co., Tex.Civ.App., 65 S.W.2d 334; Cf. Texas Breeders & Racing Ass'n v. Blanchard, 5 Cir., 81 F.2d 382.